UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

THE FEDERAL DEPOSIT INSURANCE
CORPORATION, as Receiver for
First Priority Bank, Bradenton,
Florida,

        Plaintiff,

v.                       CASE No.: 8:11-cv-2831-T-33MAP

ICARD, MERRILL, CULLIS, TIMM,
FUREN & GINSBURG, P.A., and
ROBERT MESSICK, ESQ.,

        Defendants.
_____/

**ORDER**

This matter comes before the Court pursuant to Defendants' May 17, 2013, oral Motion for Directed Verdict. (Doc. # 85). In their oral Motion, Defendants asserted that Plaintiff failed to establish proximate causation for both Plaintiff's legal malpractice claim and Plaintiff's breach of fiduciary duty claim. Defendants also raised the alternative argument that Plaintiff failed to establish the applicable standard of care for a real estate attorney.

The Court deferred ruling on the oral Motion and submitted the case to the jury. Defendants filed a memorandum in support of their Rule 50 Motion (Doc. # 87) and Plaintiff responded (Doc. # 90). Thereafter, on May 22,

2013, the jury returned a verdict in favor of Plaintiff as to both of Plaintiff's aforementioned claims. (Doc. # 94). Among other findings, the jury determined that Plaintiff suffered $4,596,204.37 in damages, but that Plaintiff's damages should be reduced by $3,447,153.28 due to a failure to mitigate damages. The damages awarded by the jury to Plaintiff total $1,149,051.09.

Defendants renewed their Rule 50 Motion and submitted a memorandum in support (Doc. # 108), to which Plaintiff responded (Doc. # 109). With the Court's leave, Defendants filed a reply thereto. (Doc. # 112). After careful review, this Court denies Defendants' Motion for Directed Verdict.

## I.   **Background**

During the housing bubble, Mark Brivik planned to develop a neighborhood along the Manatee River in Sarasota, Florida. To do so, Brivik successfully garnered several co-investors and together they formed River Meadows Development, LLC. (6/19/2012 Messick Dep. Doc. # 22-5 at 39-42).

The neighborhood was to be comprised of several lots, which totaled approximately 55 acres. (Pl. Ex. # 77). Parcel 1 consisted of 17 acres and Parcel 2 consisted of 4.76 acres. (Doc. # 20-1). Parcel 4 consisted of 25 acres

and abutted the Manatee River. (Id.). Parcels 3 and 5 were narrow strips of land, which would connect Parcels 1 and 2. (Id.).

Brivik was aided in the acquisition of Parcels 1-3 and 5 by Robert Messick, Esq., who is a partner at the Icard firm. (6/19/2012 Messick Dep. Doc. # 22-5 at 39, 140). Brivik, however, was unable to acquire Parcel 4; thus Messick engaged in a series of negotiations with the attorney for the owners of Parcel 4. (5/18/2009 Messick Dep. Doc. # 23-2 at 144-145, 149). Initially, Messick sought an option to purchase Parcel 4, but was actually able to secure only a right of first refusal. (Id.); see also (Pl. Ex. ## 187, 190).

Messick and the Icard firm also represented U.S. Funding in extending Brivik's mortgage with U.S. Funding. (6/19/2012 Messick Dep. Doc. # 22-5 at 45-47). This mortgage was secured by land intended to be developed by Brivik into the aforementioned neighborhood. (Id.). The last of Brivik's extensions was due to expire on March 1, 2006. (Id.); see also (Pl. Ex. ## 120, 121). Defendants Messick and the Icard firm also acknowledge that they regularly represented U.S. Funding and other entities in

3

which Brivik was involved. (5/18/2009 Messick Dep. Doc. # 24-2 at 32-33; Doc. # 24-2 at 3-6).

In early 2006, Brivik was introduced to Steve Putnam, First Priority's former Vice President and Chief Lending Officer. (Doc. # 101 at 20). During the meeting, Brivik informed Putnam that the Parcels were to be developed, through a two phase process, into a residential neighborhood. See generally (Doc. # 101); see also (7/9/2012 Putnam Dep. Doc. # 22-2 at 55-56). Brivik also informed Putnam that he was working on acquiring an option contract for Parcel 4. (Doc. # 101 at 32). Moreover, Brivik informed Putnam that there was a preexisting mortgage held by U.S. Funding that encumbered some of the Parcels, which needed to be refinanced. (7/9/2012 Putnam Dep. Doc. # 22-2 at 52-53).

After the meeting, Putnam started the due diligence phase of the loan approval process. (Doc. # 101 at 124-127). Part of this process required Brivik to deliver various financial forms, such as the purchase and sale agreements for the previously mentioned Parcels. (Id.). From Putnam's notes of his meeting with Brivik and review of the documents submitted during the due diligence phase, Putnam drafted a preliminary Credit Approval Report (CAR),

4

dated February 1, 2006. See generally (Doc. # 101); see also (Pl. Ex. # 126). The preliminary CAR lists as collateral the assignment of an option contract to purchase Parcel 4 and priced said option as "TBD." (Pl. Ex. # 126). However, in the CAR's collateral analysis and summary sections, there is no mention of the assignment of the option contract for Parcel 4. (Id.).

The preliminary CAR was sent to Messick for review on February 7, 2006. (Doc. # 101 at 47). It was from the preliminary CAR that Messick drafted the loan commitment letter. (Id. at 44). However, there is no requirement for an assignment of an option contract for Parcel 4 in the loan commitment letter. (Pl. Ex. # 128).

On February 16, 2006, Putnam presented the preliminary CAR to First Priority's loan committee. (Pl. Ex. # 152). The unsigned minutes from that meeting show that the loan, in the amount of $5.3 million, was approved and conditioned on, inter alia, the assignment of an option contract for Parcel 4; the minutes do not show the option priced as TBD. (Id.). River Meadows and First Priority executed the loan commitment letter. See (Pl. Ex. # 128). The resultant loan documents likewise do not require the assignment of an option contract for Parcel 4. (Pl. Ex. ## 194-196). The

loan was personally guaranteed by the River Meadows investors; in addition, Parcels 1-3 collateralized the loan. (Pl. Ex. # 128). At the closing of the loan, Messick represented both River Meadows and First Priority. (Doc. # 105 at 52).

In August 2007, the River Meadows loan went into default. (Najmy Dep. Doc. # 22-1 at 73). First Priority attempted to foreclose and filed a collection action against the River Meadows guarantors. (Doc. # 104 at 307-308). The River Meadows guarantors, in turn, asserted that Messick and the Icard Firm breached their fiduciary duties. (Id.). The guarantors argued this breach relieved them from liability, the action involving the guarantors settled, and "quite a bit" of the loan "was written off by the bank." (Id. at 309; Najmy Dep. Doc. # 22-1 at 77). During the foreclosure action, First Priority failed and Plaintiff FDIC was appointed as Receiver. (7/9/2012 Putnam Dep. Doc. # 22-3 at 208). Plaintiff ultimately sold the River Meadows loan package and all rights thereto for $693,720.

Plaintiff filed suit against Messick and the Icard Firm on December 23, 2011. (Doc. # 1). In Count I, for legal malpractice, Plaintiff alleges that Defendants (1) closed the River Meadows loan without obtaining an

6

assignment of an option contract for Parcel 4 as required by the CAR; (2) failed to obtain a written waiver of the requirement to obtain an assignment of the previously mentioned option contract prior to closing the loan; and (3) failed to disclose that the previously mentioned option contract was, in fact, a limited right of first refusal. (Id.).

In Count II, for breach of fiduciary duty, Plaintiff alleges that Defendants (1) failed to inform First Priority that River Meadows never had an option contract for Parcel 4; (2) failed to explain the legal implications of having a limited right of first refusal, as compared to an option contract; (3) closed the loan without obtaining the previously mentioned option contract; (4) failed to obtain a written waiver of the requirement for the previously mentioned option contract; and (5) failed to advise First Priority of Messick's conflict(s) of interest. (Id.).

On October 8, 2012, Defendants filed a Motion for Summary Judgment as to both Counts. (Doc. # 20). Plaintiff responded on October 22, 2012 (Doc. # 23), and Defendants replied on November 5, 2012 (Doc. # 27). This Court denied Defendants' Motion. (Doc. # 30). Specifically as to causation, this Court stated that proximate cause is

ordinarily left to the jury. (Id. at 15). Moreover, this Court found that the facts presented in this case are not of such a kind that would warrant removing the element of proximate cause from the jury's consideration. (Id. at 15-16).

A jury trial occurred during the week of May 13, 2013. (Doc. ## 100-106, 113). During trial, there was extensive testimony regarding the CAR. (Id.). Putnam testified that Messick informed him of the absence of an option contract before the February 16, 2006, loan committee meeting. Putnam specifically indicated: "My recollection is that I had a phone conversation with Mr. Messick, and he informed me that Mr. Brivik had not obtained the option contract that he was trying to secure on the 25-acre parcel." (Doc. # 101 at 42). Putnam further testified that although he would not have altered the terms of the CAR, the loan committee's minutes would evidence such a change. (Id. at 51, 55). However, the minutes evidence the opposite of Putnam's testimony. (Pl. Ex. # 152). Furthermore, Putnam's testimony was inconsistent and equivocates regarding when, or even if, he became aware of the fact that the option contract did not exist. (Doc. # 101 at 42-52).

Plaintiff also offered testimony from Messick himself. (Doc. ## 101-102). In addition, the parties utilized several expert witnesses. Plaintiff called Mark Riley (Doc. ## 102-103) and Lawrence Fox, Esq., (Doc. # 104). Riley testified as an expert regarding commercial lending and underwriting practices, and Fox testified regarding the ethical standards and professional responsibilities of lawyers in the state of Florida. (Doc. ## 102-104).

At the close of Plaintiff's case, Defendants orally moved for directed verdict under Rule 50(a), Fed. R. Civ. P., on May 17, 2013. (Doc. ## 85, 104). Specifically, Defendants asserted that Plaintiff failed to establish proximate cause, and alternatively argued that Plaintiff failed to establish the applicable standard of care for a real estate attorney. (Id.). The Court deferred ruling on Defendants' Rule 50(a) Motion. (Id.).

The Defendants, for their part, called Stephen Kussner, Esq., (Doc. # 105), Anthony Alfieri, Esq., (Doc. # 104), and Jerry Neff (Doc. # 105, 113). Kussner testified regarding the practices of and standards for real estate lawyers; Alfieri testified regarding lawyers' ethical obligations and professional responsibilities; and Neff testified regarding banking practices. (Doc. ## 104-105,

113). There was also testimony from George Najmy (Doc. # 105), the former President of First Priority, and Alan Zirkelbach (Doc. # 104, 113), the former Chairman of First Priority's Board of Directors.

The jury returned its verdict in Plaintiff's favor on May 22, 2013 and Defendants have renewed their Rule 50 Motion.

## II.  **Analysis**

### A.  **Rule 50(b) Standard**

Rule 50(b) governs the instant motion and states:

> If the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. No later than 28 days after the entry of judgment . . . the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59. In ruling on the renewed motion, the court may: (1) allow judgment on the verdict, if the jury returned a verdict; (2) order a new trial; or (3) direct the entry of judgment as a matter of law.

Fed. R. Civ. P. 50(b).  Under Rule 50, a "district court should grant judgment as a matter of law when the plaintiff presents no legally sufficient evidentiary basis for a reasonable jury to find for [plaintiff] on a material element of [plaintiff's] cause of action."  Pickett v.

Tyson Fresh Meats, Inc., 420 F.3d 1272, 1278 (11th Cir. 2005) (citations omitted).  Stated differently, a district court should grant a Rule 50 motion only "if the evidence is so overwhelmingly in favor of the moving party that a reasonable jury could not arrive at a contrary verdict." Middlebrooks v. Hillcrest Foods, Inc., 256 F.3d 1241, 1246 (11th Cir. 2001). "The power to direct a verdict should be cautiously exercised." Atkin v. Tittle & Tittle, 730 So. 2d 376, 377 (Fla. 3d DCA 1999) (citation omitted).

The Court "must review all of the evidence in the record and must draw all reasonable inferences in favor of the nonmoving party[,]" but should nevertheless be mindful not to intrude into the province of the jury.  Cleveland v. Home Shopping Network, Inc., 369 F.3d 1189, 1192-93 (11th Cir. 2004). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury questions, not those of the judge." Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 150 (2000).  Moreover, a court "must disregard all evidence favorable to the moving party that the jury is not required to believe." Id. at 151. Thus "the court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is

11

uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." Id. (citation and quotations omitted).

Although a jury's findings are not inherently shielded from review, a jury's findings are nevertheless to be afforded due deference. Alphamed Pharm. Corp. v. Arriva Pharm., Inc., 432 F. Supp. 2d 1319, 1333 (S.D. Fla. 2006). In addition, a "jury may properly reconstruct a series of events by drawing an inference upon an inference[,]" Fenner v. Gen. Motors Corp., 657 F.2d 647, 650-651 (5th Cir. June 8, 1981), insofar as the inferences drawn are not "unreasonable inferences, or those at war with the undisputed facts."[1] Alphamed, 432 F. Supp. 2d at 1333 (quoting United Fire & Cas. Ins. Co. v. Garvey, 419 F.3d 743, 746 (8th Cir. 2005) (citation omitted)).

## B.   The Verdict is Supported by Sufficient Evidence

Under Florida law, there are three essential elements to a legal malpractice claim: "(1) the attorney's employment; (2) the attorney's neglect of a reasonable duty; and (3) the attorney's negligence resulted in and was

---

[1] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

the proximate cause of a loss to the client." Evans v. McDonald, 313 F. App'x 256, 258 (11th Cir. 2009) (citing Tarleton v. Arnstein & Lehr, 719 So. 2d 325, 328 (Fla. 4th DCA 1998)). Likewise, there are three essential elements to a breach of fiduciary duty claim under Florida law: (1) the existence of a fiduciary duty; (2) a breach of that duty; and (3) the breach was the proximate cause of a loss suffered by the plaintiff. Gracey v. Eaker, 837 So. 2d 348, 353 (Fla. 2002).

## 1.   Proximate Cause under Florida Law

Defendants challenge the proximate cause element for both Plaintiff's legal malpractice and breach of fiduciary duty claims. (Doc. # 87 at 1).   The "issue of proximate causation is ordinarily one to be resolved by the trier of fact." Coker v. Wal-Mart Stores, 642 So. 2d 774, 778 (Fla. 1st DCA 1994) (citing Allen v. Babrab, Inc., 438 So. 2d 356 (Fla. 1983)). However, "when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict in favor of the defendant." Gooding v. Univ. Hosp. Bldg., Inc., 445 So. 2d 1015, 1018 (Fla. 1984).

In this case, Jury Instruction Number 10, which defined proximate cause, stated:

> For damage to be the proximate result of an act or course of dealing, it must be shown that such act or course of dealing played a substantial part in causing or bringing about the damage, and that, except for such conduct, the damage would not have occurred. In other words, negligence or breach of fiduciary duty can be a "legal cause" of damage if it directly and in natural and continuous sequence produces, or contributes substantially to producing such damage, so it can reasonably be said that, except for the negligence or breach of fiduciary duty, the loss, injury or damage would not have occurred. Negligence or breach of fiduciary duty may be a legal cause of damage even though it operates in combination with the act of another, some natural cause, or some other cause if such other cause occurs at the same time as the negligence or breach of fiduciary duty and if the negligence or breach of fiduciary duty contributes substantially to producing such damage.

(Doc. # 99 at 12).[2]

### a.   Legal Malpractice

The question, therefore, presented to the Court is whether there is a sufficient evidentiary basis from which a jury could reasonably infer facts establishing that Defendants proximately caused Plaintiff's injury as to the legal malpractice claim. After careful review of the

---

[2] Neither party objected to Jury Instruction 10 during the charge conference. See (Doc. # 113 at 41-60). In addition, it is notable that Defendants indicate in their Reply Memorandum filed in support of their Motion for Directed Verdict that "Defendants are not arguing that the jury was improperly charged or that the Verdict Form was erroneous." (Doc. # 112 at 3).

evidence and trial transcripts, the Court determines a reasonable jury could find such causation.

As a preliminary matter, the Court finds it helpful to define the injury at issue. The injury was not Plaintiff's inability to foreclose on the collateral. Rather, the injury occurred when First Priority was committed to a loan it otherwise would not have made. See (Doc. # 1 at ¶ 24).

Prior to drafting the CAR, Putnam interviewed Brivik in order to gain an understanding of the proposed project for which the loan proceeds would be used, and Putnam testified that Brivik indicated he was trying to secure an option contract for Parcel 4. (Doc. # 101 at 32). Putnam further testified that, during the due diligence phase of the loan process, Brivik provided documents concerning the project; however, Putnam did not specifically recall whether he saw Plaintiff's Exhibit 181, the purchase and sale agreement. (Id. at 124-127). The purchase and sale agreement reflects a right of first refusal rather than an option contract. (Pl. Ex. # 181). The same document contains a diagram depicting Phase I with a property labeled "option property." (Id.).

After this process was completed, Putnam drafted a preliminary CAR dated February 1, 2006, which was sent to

Messick on February 7, 2006. (Doc. # 101 at 44-47). The preliminary CAR and the CAR as approved are identical. Compare (Pl. Ex. # 126), with (Pl. Ex. # 136). The CAR lists as a requirement of the loan an assignment of an option contract for Parcel 4, which is priced as "TBD." (Id.). Additionally, the CAR states that the loan is being issued to fund the development of a neighborhood, which was bifurcated into two phases. (Id.). However, the latter portions of the CAR (specifically the collateral analysis and summary sections) do not address the assignment of an option contract. (Id.).

Furthermore, Putnam's testimony regarding whether he knew there was not an option contract for Parcel 4 and when he became aware of such a fact is in conflict. At one point, Putnam indicated that he recalls having a phone call with Messick – prior to the February 16, 2006, loan committee meeting – during which Messick informed Putnam that Brivik had failed to obtain an option contract. (Doc. # 101 at 42). However, shortly thereafter, Putnam's testimony was impeached; in his July 9, 2012, deposition Putnam testified that he did not know the option contract did not exist until after the approval. (Id. at 50).

Putnam also testified that he would not change the terms of the CAR and would instead rely on the February 16, 2006, minutes to evidence the absence of the option contract. (Id. at 71). Yet, the minutes reflect no such commentary regarding the absence of the option contract, and Putnam himself testified that he assumed he would have made a comment to the loan committee, but does not recall. (Id. at 59). The minutes do not indicate that Putnam commented on the CAR's error regarding the option contract and assignment thereof. (Pl. Ex. # 152). In fact, the minutes reflect the opposite; the minutes show that approval of the loan was conditioned on the assignment of an option contract, which had no qualification of being priced as TBD, for Parcel 4. (Id.). While the minutes are not signed (Id.), Plaintiff introduced evidence suggesting that committee minutes were not signed on a regular basis. See (Pl. Ex.'s ## 53, 55, 56); see also (Doc. # 105 at 44) (Najmy never provided his lawyer with another copy of the February 16, 2006, minutes).

Putnam further testified that the option contract and its assignment were of no consideration to the loan committee. (Doc. # 101 at 104). However, Putnam provided testimony that could be interpreted as supporting the

opposite conclusion. For example, Putnam testified that First Priority wanted an assignment of the engineering plans associated with the development, because they added value to the overall collateral, despite having no intrinsic value. (Id. at 102). Additionally, Putnam testified that he knew Brivik had offered $6,000,000 in attempting to purchase the option contract for Parcel 4. (Id. at 113). Moreover, Parcels 1-3, the aggregate acreage being approximately 22 acres, were appraised to be worth $8,339,000. (Id. at 139). Thus an inference could be made that Parcel 4, comprised of 25 acres in the same vicinity as parcels 1-3, was worth at between 6 and 8.3 million dollars. If engineering plans add value, then it is reasonable to infer an option to purchase 25 acres of land worth between 6 and 8.3 million dollars would be valuable and would be a consideration of First Priority in making the loan. See also (Doc. # 105 at 59-60) (Najmy admitting that Parcel 4 was valuable and unique).

And as to Messick's testimony regarding what he told Putnam and when, the jury was not required to believe such testimony. As a preliminary reason, Messick is a defendant in this case – i.e. an interested party – and under Reeves a jury is not required to believe testimony from interested

18

parties. 530 U.S. at 150-151. This is especially true when, as here, the interested party's testimony is contradicted. Indeed, Messick's testimony that he told Putnam there was no option contract, either in person or over the phone, is not supported by Defendants' own invoices, as explained below.

A comparison of the two invoices in evidence could lead to the inference that Messick did not inform Putnam of the absence of the option contract. Compare (Pl. Ex. # 133), with (Pl. Ex. # 135). In one invoice, the entries are detailed; for instance, an entry dated 9-15-05 for 2.5 hours included: "detailed review of contract and proposed revisions: follow up with Dan Buff and Bob Carr: Continued efforts regarding loan modifications and follow up." (Pl. Ex. # 133). However, in the other invoice, none of the six entries provide such a detailed description or even mention a brief phone call. (Pl. Ex. # 138).

Additionally, the jury could look to the fact that Messick sent Putnam a email outlining an error in calculating certain amounts of the loan (Pl. Ex. # 84), but did not do so for the absence of the option contract as evidence suggesting that Messick never informed Putnam of the option contract's nonexistence. By comparing the two

invoices and by looking at the emails or lack thereof, a reasonable jury could conclude that Messick's testimony was self-serving and not supported by the evidence.

Finally, it was within the province of the jury to determine what level of credibility and weight to assign to the respective testimony of Najmy and Zirkelbach, both of whom testified that the loan was not conditioned on the missing option contract. It was reasonable for the jury to determine that Najmy's and Zirkelbach's credibility was less than, individually or cumulatively, that of the CAR and the February 16, 2006, minutes. Indeed, it is reasonable for a jury to assign a higher value and level of credibility to a written document than to contradictory and often obfuscated oral testimony. After all, the purpose of writing information down is to compensate for the tendency of memories to fade or change.

Given the foregoing, the Court determines that a reasonable jury could find that Defendants proximately caused Plaintiff's injury as to the legal malpractice claim.

### b. __Breach of Fiduciary Duty__

The second question presented to the Court is whether there is a sufficient evidentiary basis from which a jury

could reasonably infer facts establishing that Defendants proximately caused Plaintiff's injury as to the breach of fiduciary duty claim. After careful review of the evidence and trial transcripts, the Court determines a reasonable jury could such find causation.

In 2006, when First Priority engaged Messick in preparing and closing the loan, Rule 4-1.7 of the Rules Governing the Florida Bar stated in pertinent part:

> (a) **Representing Adverse Interests.** A lawyer shall not represent a client if the representation of that client will be directly adverse to the interests of another client, unless:
> (1) the lawyer reasonably believes the representation will not adversely affect the lawyer's responsibilities to and relationship with the other client; and
> (2) each client consents after consultation.
> (b) **Duty to Avoid Limitation on Independent Professional Judgment.** A lawyer shall not represent a client if the lawyer's exercise of independent professional judgment in the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person or by the lawyer's own interest, unless:
> (1) the lawyer reasonably believes the representation will not be adversely affected; and
> (2) the client consents after consultation.
> (c) **Explanation to Clients.** When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved.

Fla. Rule of Professional Conduct 4-1.7 (2006).

The evidence shows that Defendants represented, either at the time of the loan or previously, all parties involved with the loan. See (Pl. Ex. # 138) (showing that Defendants represented First Priority); (Pl. Ex. # 133) (showing that Defendants represented Mark Brivik); (Pl. Ex. # 117) and (Doc. # 104 at 52) (showing Defendants were to represent First Priority and River Meadows); (Doc. # 101 at 280-281) (testimony that Defendants represented U.S. Funding); (Doc. # 101 at 286) (testimony that Defendants represented River Meadows). Moreover, there was evidence submitted that, in a prior suit, the River Meadows guarantors asserted that they were not liable because of Defendants' breach of fiduciary duty. (Doc. # 104 at 307-308).

While Defendants assert that Messick informed Putnam of the conflict of interest with regards to the River Meadows transaction (Doc. # 102 at 35-36), the evidence is not overwhelmingly in support of that contention, as previously stated.

It is also without question that the attorney-client relationship creates a fiduciary duty. FDIC v. Martin, 801 F. Supp. 617, 620 (M.D. Fla. 1992). "A person acting in a fiduciary . . . capacity has a duty to make a full and fair

disclosure of material facts to a person reposing confidence in him." Id. There was sufficient evidence presented during trial that Defendants failed to disclose the fact that there was not an option contract to purchase Parcel 4. See (Pl. Ex. ## 187, 190). As previously mentioned, it was reasonable for the jury to determine that Defendants did not inform Putnam of the option contract's nonexistence by comparing the invoices in evidence. Compare (Pl. Ex. # 133), with (Pl. Ex. # 138).

Plaintiff also introduced expert testimony from Fox that Rule 4.1-7 requires an attorney to disclose conflicts of interest, as well as to discuss the ramifications and consequences stemming from such conflicts. See e.g. (Doc. # 104 at 133). A jury could infer from the evidence and use common sense to find that, had First Priority known of the true extent of Defendants' conflicts of interest, especially that such conflicts represented a potential bar to collection from the guarantors, then First Priority would not have made the loan. Indeed, it is reasonable to infer from First Priority's actions to secure the loan that First Priority would not have made the loan had it known it might not be able to collect.

Thus, the Court determines that a reasonable jury could reasonably infer that Defendants proximately caused Plaintiff's injury as to the breach of fiduciary duty claim.

In reaching this conclusion as to both Counts, the Court is mindful that it may neither reweigh the evidence nor make credibility determinations. See Reeves, 530 U.S. at 150. Further, under Rule 50, the Court is only to direct a verdict in Defendants' favor if the evidence is so overwhelmingly in favor of Defendants that no reasonable person could reach a contrary conclusion. See Middlebrooks, 256 F.3d at 1246. The testimony in this case vacillates and is often contradicted by various documents in evidence. The disputed facts do not lend themselves to establishing one and only one conclusion.

## 2. Standard of Care

Defendants alternatively argue that Plaintiff failed to establish the applicable standard of care for a real estate attorney. (Doc. # 87).[3] Whether a lawyer has met the standard of care requires expert testimony. Willage v. Law

---

[3] Plaintiff claims that Defendants abandoned their standard of care arguments. It is not clear that these arguments have been abandoned and the Court will accordingly address Defendants' contentions regarding the standard of care.

Offices of Wallace & Breslow, P.A., 415 So. 2d 767, 768
(Fla. 3d DCA 1982). Furthermore, a "review of Florida law
indicates that a legal malpractice plaintiff must present
expert testimony to establish the appropriate standard of
care (and breach thereof) unless the lawyer's lack of care
and skill is so obvious that the trier of fact can resolve
the issue as a matter of common knowledge". Evans, 313 F.
App'x at 258 (citation omitted). Examples of situations
where the lack of care was so obvious that expert testimony
was not required include failure to file a notice of
appearance, advising clients not to answer interrogatories
as directed by a judge, and failure to file a claim within
the statute of limitations. Id. at 258.

Here, Fox's testimony was sufficient to establish the
applicable standard of care for an attorney practicing in
Florida. Fox provided expert testimony regarding the Rules
of Professional Conduct and ethical standards. See
generally (Doc. # 103 at 215-230); (Doc. # 104 at 14-121).
Recently, one Florida court has emphasized:

> **Violation of a rule should not itself give rise
> to a cause of action against a lawyer nor should
> it create any presumption in such a case that a
> legal duty has been breached.** In addition,
> violation of a rule does not necessarily warrant
> any other nondisciplinary remedy, such as
> disqualification of a lawyer in pending

litigation. The rules are designed to provide guidance to lawyers and to provide a structure for regulating conduct through disciplinary agencies. **They are not designed to be a basis for civil liability. Furthermore, the purpose of the rules can be subverted when they are invoked by opposing parties as procedural weapons**. The fact that a rule is a just basis for a lawyer's self-assessment, or for sanctioning a lawyer under the administration of a disciplinary authority, does not imply that an antagonist in a collateral proceeding or transaction has standing to seek enforcement of the rule. Accordingly, nothing in the rules should be deemed to augment any substantive legal duty of lawyers or the extra-disciplinary consequences of violating such duty. **Nevertheless since the rules do establish standards of conduct by lawyers, a lawyer's violation of a rule may be evidence of a breach of the applicable standard of conduct.**

Greenwald v. Eisinger, Brown, Lewis & Frankel, P.A., No. 3D12-1181, 2013 WL 3455600, at *2 (Fla. 3d DCA July 10, 2013) (emphasis in original).

Thus, although a breach of the Rules of Professional Conduct neither creates an independent cause of action nor per se proves negligence, the Rules of Professional Conduct do establish a baseline standard of care, which is applicable to all attorneys. See id. ("a [v]iolation of the Code of Professional Responsibility does not prove negligence per se, . . . but it may be used as some evidence of negligence.") (alteration in original) (citations omitted). As such, Fox's testimony regarding the

Florida Rules of Professional Conduct and ethical considerations was sufficient to establish the standard of care applicable to Defendants. See generally (Doc. # 103 at 215-230; Doc. # 104 at 14-121).

Assuming, arguendo, that Plaintiff failed to present expert testimony establishing the applicable standard of care for an attorney practicing in Florida, such a standard was established by Defendants' expert Kussner. As previously stated, the Court "must review all of the evidence in the record and must draw all reasonable inferences in favor of the nonmoving party". Cleveland, 369 F.3d at 1192-93. Thus, for purposes of Defendants' Rule 50 motion, the expert testimony proffered by Defendants can be relied on by Plaintiff.

The Evans court addressed a similar issue. As a preliminary matter, the Court recognizes that Evans was decided at the summary judgment stage; however, as the Supreme Court stated, "the standard for granting summary judgment mirrors the standard for judgment as a matter of law, such that the inquiry under each is the same." Reeves, 530 U.S. at 150 (internal quotations and citations omitted). In Evans, plaintiff failed to introduce expert testimony regarding the applicable standard of care and, on

27

appeal, attempted to rely on the expert testimony proffered by the defendant. Id. at 259 n.5. The Evans court did not reject plaintiff's reliance on defendant's expert testimony; rather the Evans court rejected plaintiff's interpretation of the expert's testimony. Id.

Kussner provided testimony that he would have informed Plaintiff of the nonexistence of the option contract and the difference between a right of first refusal and option contract. See generally (Doc. # 105 at 98-108); see also (Id. at 132, lines 1-11). Here, the Court finds that sufficient expert testimony was proffered to establish the standard of care applicable to Defendants.

III. **Conclusion**

The evidence in this case is contradictory and the testimony presented is often inconsistent with prior statements and written documents. After reviewing all of the evidence submitted to the jury and the trial transcripts, the Court cannot say that the evidence is so overwhelmingly in Defendants' favor to warrant a directed verdict. Neither can the Court say that there is an insufficient evidentiary basis from which a jury could infer that Defendants proximately caused Plaintiff's injury.

Accordingly it is

**ORDERED**, **ADJUDGED**, and **DECREED**:

(1)   Defendants' Motion for Directed Verdict (Doc. # 85) is

**DENIED**.

(2)   The Clerk is directed to enter Judgment in Plaintiff's

favor consistent with the jury's verdict and shall

thereafter close the case.

**DONE** and **ORDERED** in Chambers in Tampa, Florida this

15th day of August, 2013.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE


Copies furnished to: All Counsel and Parties of Record